AARON SPOLIN (State Bar No. 310379)
JEREMY CUTCHER (State Bar No. 301097)
ClientMail@SpolinLaw.com
SPOLIN LAW P.C.
11500 W. Olympic Blvd., Suite 400
Los Angeles, CA 90064
(310) 424-5816
(310) 312-4551

Attorneys for Petitioner

## IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

MARCUS COLUMBUS EUGENE,

   Petitioner,

  vs.

RON BROOMFIELD, as Warden, San Quentin State Prison,

   Respondent.

Case No.: 22-3844

**Petitioner Marcus Columbus Eugene's Verified Petition for Writ of Habeas Corpus by a Person in State Custody Under 28 U.S.C. § 2254.**

  Petitioner, Marcus Columbus Eugene (hereinafter "Petitioner"), through undersigned counsel, files this Verified Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, and in support thereof, avers as follows:

### A.  Procedural History

  1.  Petitioner is Marcus Columbus Eugene.

2.     Petitioner is unlawfully confined in the San Quentin State Prison pursuant to a judgment of the Superior Court of California for Riverside County in *People v. Eugene,* case number RIF1770138.

3.     Petitioner is currently unlawfully confined in the San Quentin State Prison, Main Street, San Quentin, CA 94964.

4.     Ron Broomfield is the warden of the San Quentin State Prison.

5.     On August 21, 2017, the People filed an amended information charging Petitioner with murder (P.C. § 187(a); count one), participating in a gang with knowledge its members engage in criminal conduct (P.C. § 186.22(a); count two), and being a felon in possession of a firearm (P.C. § 29805; count four).

6.     As to count one, the People alleged that Petitioner personally used a firearm causing great bodily injury or death (P.C. § 12022.53(d) and (e)) and that Petitioner did so to benefit a gang (P.C. § 186.22(b)(1)(A)).

7.     Trial commenced on January 29, 2018, and on February 8, 2018, the jury found Petitioner guilty as charged, found the murder to be in the first-degree, and found true the enhancements.

8.     On May 3, 2018, the trial court sentenced Petitioner to 52 years to life imprisonment.

9.     That same day, Petitioner filed a timely notice of appeal.

10.     On December 14, 2020, the California Court of Appeal, Fourth District, Division Two, reversed Petitioner's firearm possession conviction where he did not commit one of the prohibited enumerated offenses under P.C. § 29805, but affirmed in all other, relevant respects.

11.     On January 19, 2021, Petitioner filed a petition for review with the California Supreme Court which was denied on March 10, 2021.

## B.     Factual History

12.     The following facts are largely incorporated from Petitioner's opening brief on direct appeal:

On March 5, 2016, Unique Jessie was at a party for her cousin in a hotel room. (1RT 31, 100.) Petitioner and Muhammad arrived at the party with others. (*Id.*) At some point, Petitioner and Tai Vey McNeal ("TJ") said they were bored and wanted to leave the party. (1RT 101.)[1] Petitioner and TJ had asked the other males at the party what gang they were from, and those males said something about Lancaster. (1RT 102.) Eventually, a group consisting of Petitioner and his friends went downstairs to the hotel parking lot. (1RT 103-104.) There, they decided to go to a house party elsewhere in Riverside County in a gated community. (1RT 109; 2RT 190, 263.)

---

[1] Various people involved were often referred to by their moniker or simply their first name. Petitioner shall include full names where possible.

The group rode in different cars. Petitioner and Muhammad were going to ride with Sheldon Bruce. (1RT 108.) Bruce testified though that he only took Petitioner to the party and Muhammad drove with "Keisha." (3RT 441, 445.) Jessie saw Petitioner and Muhammad move guns from TJ's car to Bruce's car. (1RT 104.) Jessie testified that she often went to parties with Petitioner and he always had a gun. (1RT 106.) It was a large one and would stay in the car. (*Id.*) Muhammad's gun was smaller. (1RT 107.) They both moved the guns to the trunk of Bruce's car. (Id.) She did not see anyone else from their group with a gun. (1RT 107.) Bruce however said that TJ had a gun on him as well. (3RT 439.)

Jessie went to the party in TJ's car. (1RT 108.) With her were Savannah Carter, Mekaylah Reed, and "Baby C Note." (1RT 107-108.) "Ritchie" drove his own car. (1RT 112.) Armando Williams and his brother Antonio Williams arrived at the party together about 30 minutes after the others. (1RT 117; 2RT 314.)

In order to get into the gated community, each of the cars passed through a guarded gate where they needed to show identification. (1RT 109.) Jessie testified that her group parked away from the house. (1RT 114.) Because parties are not typically safe, they park in a place where it is easy to leave the party. (Id.) Bruce parked his car in the cul-de-sac. (3RT 444.) Armando and Antonio parked across from the party house next to a light pole. (2RT 317-318.)

After some period of time at the party, a tall African American male asked Petitioner where "he is from." (1RT 117.) Petitioner stated he was associated with Colton City Crips ("CCC"), they argued, and eventually a fight started inside the kitchen area. (1RT 38, 118-119.) All the males with their group got involved in the fight. (1RT 120.) The fight did not last very long, about 10 to 15 seconds. (1RT 39.)

Joseff Cody was a college friend of the party host. (1RT 33.) He estimated there were 200 to 300 people there with no real security. (1RT 35-36.) After the fight, he and some friends started pushing people towards the door. (1RT 39.) On the way out, he heard someone shout "Crips" and the number 3. (1RT 42-43.) It was a male voice and came from the group he had pushed out the door. (1RT 43-44.) He saw people go various directions, with two going towards the cul-de-sac. (1RT 46.)

TJ handed Jessie the keys to his car and told her to go get it. (1RT 120.) She and the other women ran to the car. (*Id.*) Armando and Antonio walked to their car as well. (1RT 122.)

Bruce gave Petitioner the keys to his car. (3RT 452.) Petitioner opened the car and got his gun. (*Id.*) Bruce testified that people from the other group, about 5 to 6 of them, were walking in the opposite direction from the cul-de-sac. (3RT 454.) The party house was on the edge of the cul-de-sac, with the cul-de-sac slightly north of the house. Bruce walked to his car. (3RT 453.)

Cody saw two people walking from the cul-de-sac heading south. (1RT 52.) One of them was the person who went to the trunk and the other met up with that person. (1RT 68.) The one who was at the trunk was wearing black pants and a black shirt with a pattern on it. (1RT 63.) He saw one of the people reach towards his waist and extend his arm. (1RT 52.) Gunshots were fired. (1RT 56.) He believed it was a .9 mm and a .22. (*Id.*) The two people were firing simultaneously and next to each other. (*Id.*) He estimated 8 to 9 rounds were expelled per gun and the gunfire was coming from the cul-de-sac area. (1RT 56-57.) Cody could not tell if any guns were returning fire but he believed that one gun was firing close to him and one was firing from a distance away from him. (1RT 73, 75.)

Armando and Antonio were heading towards their car directly across from the party house. (2RT 317-318.) He estimated it took 15 to 30 seconds to get to his car. (2RT 323.) Armando saw Petitioner about 10 steps behind Antonio's car in the middle of the street. (*Id.*) He was near the cul-de-sac. (*Id.*) He heard the shooting and saw Muhammad and Petitioner with guns. (2RT 327.) At first, Petitioner shot into the air. (2RT 333.) Petitioner then shot down the street. (3RT 460.) Muhammad was on Armando's side of the car and was 14 to 15 feet behind him. (2RT 333, 339.) Armando dropped to the ground. (2RT 327.) When the shooting stopped, TJ, who had been near a gate, ran out and said that Antonio had been shot. (2RT 327-328.) Antonio was at the driver's side door of his car. (2RT 330, 342-343.)

Petitioner gave his gun to Keisha. (3RT 471.) Bruce drove to pick up Petitioner and they left the area. (3RT 472.)

After some difficulty, and with the help of Muhammad and TJ, Armando was able to get his brother into their car. (2RT 344.) Petitioner and Sheldon drove by, and Petitioner stated they were leaving. (2RT 345.) They drove to the hospital. (2RT 286.) Once there, the police arrived and Muhammad told the group to let him do the talking. (1RT 140; 2RT 286.) TJ and Muhammad told the others not to say anything. (2RT 208.) Muhammad said he wanted to deal with police because he had gunpowder on his hands. (2RT 140, 209.)

Antonio died from a single gunshot wound. (3RT 597.) It entered the upper back and exited the left temple. (3RT 587-590.) It was from a medium caliber gun. (3RT 593.) Both of the guns used in this case, based upon the shell casings, were medium caliber. (3RT 594.)

Bruce testified that he saw Petitioner a couple of days after the shooting. (3RT 476.) He told Bruce that he was going to Arizona because he thought the police may be after him. (Id.) A few days later, someone fired 8 to 10 shots through Bruce's back window. (3RT 476.)

Riverside Sheriff's Department Investigator Ruben Paz processed the scene. (3RT 519-520.) He found, among other things, shell casings from two guns. (3RT 550.) He found 13 .40 caliber shells, and seven .9mm shells. (*Id*.) He found that the

person shooting the .40 caliber was in the street and the person shooting the .9mm was closer to the curb line. (3RT 551.) He found no evidence of a person shooting towards the cul-de-sac. (3RT 553.) Based on the evidence, he placed the two shooters outside 8134 Sunset Rose. (3RT 559.) He also found possible blood in the area among the shell casings. (3RT 539-540.) However, no one tested the substance to see if it was actually blood. (3RT 660.)

<u>Gang Evidence</u>

Numerous witnesses testified that they knew Petitioner as having the moniker Quata Pound and Muhammad as Quata Mill or Quata Rod. (1RT 79-83; 2RT 175-178; 3RT 397-399.)

Jessie testified that she had heard both Petitioner and Muhammad claim they were from CCC and that they wear clothing associated with that gang. (1RT 88-91.) Carter had also heard Petitioner self-admit to being in CCC. (2RT 180.) Reed believed that both Petitioner and Muhammad associated with that gang. (2RT 259.) Bruce testified that Petitioner had been jumped into CCC and had been sponsored through his brother. (3RT 408-410.) He had seen Petitioner wearing gang attire. (*Id*.) He also testified that Muhammad self-identified as a member of that gang and would likewise wear gang attire. (3RT 411.)

Michael Collins testified as an expert in criminal street gangs in general and in CCC specifically. (3RT 611-618.) Collins discussed how a person can become a

member of a gang, including being jumped into it, and that a person can also leave the gang. (3RT 620-622.) He stated that police identify gang members by self-admission, by tattoos, clothing, or by a person hanging out with other members of the gang in their turf. (3RT 622-624.) Gangs use fear and intimidation to gain a reputation within the community and members do so to get higher status within the gang. (3RT 627.)

Collins believed that CCC started in the 1980's, currently had about 50 active members, and had specific colors and symbols associated with it. (3RT 628.) The gang's primary activities included several crimes including murder. (3RT 630.) Collins introduced three predicate offenses involving members of CCC. (3RT 631-636.)

Collins opined that Petitioner was a member of CCC. (3RT 637-639.) He based this upon Petitioner's tattoos, the various witnesses in the case stating that Petitioner claimed the gang, his social media pictures, clothing, and that he associates with numerous members of the gang. (3RT 638-639.) He also believed that Muhammad was a member of the same gang. (3RT 639-641.) As for this crime, Collins testified that the two committed it in association with another member of the gang. (3RT 642.)

Finally, Collins stated that this specific crime would have benefitted both the gang and those involved because of its violence and the fact it instills fear. (3RT 644-648.)

## C.   Claims for Relief

### I.   Claim One

13.   Paragraphs 1 through 12 are hereby incorporated by reference.

14.   Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the evidence was constitutionally insufficient to support the jury's findings that both Petitioner and his co-defendant personally and intentionally discharged a firearm and proximately caused great bodily injury where the undisputed evidence proved that only one bullet struck the victim, and where it violated due process to treat the jury's verdicts as mere clerical error.

15.   Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

16.   The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim One is hereby incorporated by reference.

## II.    Claim Two

17.    Paragraphs 1 through 16 are hereby incorporated by reference.

18.    Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court erred in failing to instruct the jury that in a case with gang-related charges, and involvement by individuals with multiple gang allegiances, each defendant must be found to have committed the crime for the benefit of, at the direction of, or in association with a particular gang.

19.    Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

20.    The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Two is hereby incorporated by reference.

## III.    Claim Three

21.    Paragraphs 1 through 20 are hereby incorporated by reference.

22.    Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court erred by admitting a rap music video purportedly depicting Petitioner in the driver's seat of a

car, cocking an object that looks like a gun, and his co-defendant in the passenger's seat throwing gang signs.

23.   Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

24.   The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Three is hereby incorporated by reference.

**IV.   Claim Four**

25.   Paragraphs 1 through 24 are hereby incorporated by reference.

26.   Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the evidence shows it was factually impossible for either Petitioner or his co-defendant to have killed the victim.

27.   Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

28.   The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Four is hereby incorporated by reference.

### V.    Claim Five

29.    Paragraphs 1 through 28 are hereby incorporated by reference.

30.    Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to trial counsel's ineffectiveness.

31.    Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

32.    The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Five is hereby incorporated by reference.

### VI.    Claim Six

33.    Paragraphs 1 through 32 are hereby incorporated by reference.

34.    Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where he is legally, factually, and actually innocent of the offenses of which he was convicted.

35.    Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

36.     The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Six is hereby incorporated by reference.

**D.     Prayer for Relief**

WHEREFORE, Petitioner respectfully requests that this Honorable Court:

1.     Take judicial notice of the transcripts, records, and files in Marcus Columbus Eugene: Riverside County, case number RIF1770138; California Court of Appeal, Fourth District, Division Two, case number E070456; California Supreme Court case number S266734.

2.     Order Respondent and the People of California to file and serve a certified copy of the record on appeal and show cause why Petitioner is not entitled to the relief sought;

3.     Grant a hearing to enable Petitioner to satisfy his remaining burden of proof, namely that the error had a substantial and injurious effect or influence in determining the jury's verdict;

4.     Find that the state court unreasonably determined the facts and unreasonably applied clearly established Federal law;

5.     Grant this Petition for Writ of Habeas Corpus; and

6.     Grant Petitioner any additional, appropriate relief as ordered by this Honorable Court.

1   Dated: June 2, 2022                    Respectfully submitted,

2

3                                          SPOLIN LAW P.C.

4                                 By:      /s/ Aaron Spolin

5                                          Aaron Spolin
                                           Jeremy Cutcher
6                                          Attorneys for Petitioner

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **VERIFICATION**

I, Aaron Spolin, hereby declare as follows:

I am an attorney admitted to practice law in the State of California. I represent Petitioner herein, who is confined and restrained of his liberty at the San Quentin State Prison in Marin County. I have read the foregoing Petition for Writ of Habeas Corpus and am informed and believe the allegations therein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 2, 2022, at Los Angeles, California.


/s/ Aaron Spolin
Aaron Spolin

AARON SPOLIN (State Bar No. 310379)
JEREMY CUTCHER (State Bar No. 301097)
ClientMail@SpolinLaw.com
SPOLIN LAW P.C.
11500 W. Olympic Blvd., Suite 400
Los Angeles, CA 90064
(310) 424-5816
(310) 312-4551

Attorneys for Petitioner

# IN THE UNITED STATES DISTRICT COURT FOR THE
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARCUS COLUMBUS EUGENE,<br><br>Petitioner,<br><br>vs.<br><br>RON BROOMFIELD, as Acting Warden, San Quentin State Prison,<br><br>Respondent. | Case No.: 22-3844<br><br>**Memorandum of Points and Authorities** |

Petitioner, through counsel Aaron Spolin, hereby submits the following Memorandum of Points and Authorities in support of his Petition, filed pursuant to 28 U.S.C. § 2254.

# TABLE OF CONTENTS

Table of Authorities ..................................................................5

1.    Statement of the Case ....................................................11

2.    Law and Argument ........................................................11

   A.   Habeas Standards.......................................................11

   B.   Timeliness..................................................................13

   C.   Exhaustion ................................................................15

   D.   Substantive Claims ....................................................16

   I.    Claim One—Petitioner Was Denied His Federal Constitutional Right to
   Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the
   Evidence Was Constitutionally Insufficient to Support the Jury's Findings that
   Both Petitioner and His Co-Defendant Personally and Intentionally
   Discharged a Firearm and Proximately Caused Great Bodily Injury Where the
   Undisputed Evidence Proved that Only One Bullet Struck the Victim, and
   Where it Violated Due Process to Treat the Jury's Verdicts as Mere Clerical
   Error...........................................................................................16

   II.   Claim Two—Petitioner Was Denied His Federal Constitutional Right to
   Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the
   Trial Court Erred in Failing to Instruct the Jury that in a Case with Gang-

Related Charges, and Involvement by Individuals with Multiple Gang Allegiances, Each Defendant Must Be Found to Have Committed the Crime For the Benefit of, at the Direction of, or in Association with a Particular Gang...........................................................................................................19

III.    Claim Three—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erred by Admitting a Rap Music Video Purportedly Depicting Petitioner in the Driver's Seat of a Car, Cocking an Object that Looks Like a Gun, and His Co-Defendant in the Passenger's Seat Throwing Gang Signs. .23

IV.    Claim Four—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Evidence Shows it Was Factually Impossible for Either Petitioner or His Co-Defendant to Have Killed the Victim. ......................................................28

V.    Claim Five—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to Trial Counsel's Ineffectiveness. .................................................................................32

VI.    Claim Six—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where He Is Legally, Factually, and Actually Innocent......................................................51

Conclusion..........................................................................................54

Certificate of Service....................................................................55

# TABLE OF AUTHORITIES

## Cases

*a la Bruton v. United States*, 391 U.S. 123 (1968)....................................................27

*Apprendi v. New Jersey,* 530 U.S. 466 (2000) .........................................................17

*Baldwin v. Reese,* 541 U.S. 27 (2004)......................................................................15

*Baylor v. Estelle,* 94 F.3d 1321 (9th Cir. 1996) ......................................................39

*Bell v. Cone,* 535 U.S. 685 (2002) ..........................................................................12

*Bowen v. Roe*, 188 F.3d 1157 (9th Cir. 1999)...........................................................15

*Boyde v. California,* 494 U.S. 370 (1990)................................................................20

*Cam v. Calderon,* 165 F.3d 1223 (9th Cir. 1999) ....................................................39

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997).....................................................52

*Duncan v. Louisiana,* 391 U.S. 145 (1968)...............................................................17

*Dunn v. United States,* 284 U.S. 390 (1932) ............................................................17

*Edwards v. Carpenter,* 529 U.S. 446 (2000).............................................................15

*Engle v. Isaac,* 456 U.S. 107 (1982) .......................................................................24

*Estelle v. McGuire,* 502 U.S. 62 (1991) ..................................................................20

*Evanchyk v. Stewart,* 340 F.3d 933 (9th Cir. 2003) .................................................20

*Ferrizz v. Giurbino*, 432 F.3d 990 (9th Cir. 2005)....................................................17

*Gordon v. Duran,* 895 F.2d 610 (9th Cir.1990) ........................................................25

*Greene v. Fisher*, 565 U.S. 34 (2011) ......................................................................12

*Harrington v. Richter,* 562 U.S. 86 (2011) ............................................................11

*Herrera v. Collins,* 506 U.S. 390 (1993)......................................................51, 52, 53

*Ho v. Carey,* 332 F.3d 587 (9th Cir. 2003) ...........................................................20

*In re Cordero,* 46 Cal.3d 161 (1988) ....................................................................39

In re Edward S., 173 Cal.App.4th 387 (2009).......................................................37

In re Hall, 30 Cal.3d 408 (1981) ...................................................................37, 38

In re Neely, 6 Cal.4th 901 (1993).........................................................................37

*In re Noday,* 125 Cal.App.3d 507 (1981) ..............................................................38

*In re Saunders,* 2 Cal.3d 1033 (1970) ..................................................................35

*In re Sixto,* 48 Cal.3d 1247 (1989) ......................................................................39

*In re Winship,* 397 U.S. 358 (1970) .....................................................................31

*Jackson v. Virginia,* 443 U.S. 307 (1979)............................................................52

*Jammal v. Van de Kamp*, 926 F.2d 918 (9th Cir. 1991)......................................24

*Kealohapauole v. Shimoda,* 800 F.2d 1463 (9th Cir.1986)..................................24

*Kelly v. Small*, 315 F.3d 1063 (9th Cir. 2003) .....................................................16

Lavallee v. Justices in Hampden Sup. Ct., 442 Mass. 228 (2004).........................38

*MacFarlane v. Walter,* 179 F.3d 1131 (9th Cir. 1999) ........................................13

*Masoner v. Thurman*, 996 F.2d 1003 (9th Cir. 1993) ..........................................18

*Middleton v. McNeil,* 541 U.S. 433 (2004) ..........................................................20

*Moses v. Payne,* 555 F.3d 742 (2009) ..................................................................13

O'Brien v. Dubois, 145 F.3d 16 (1st Cir. 1998).................................................................13

*O'Sullivan v. Boerckel,* 526 U.S. 838 (1999)..................................................................15

*People v. Albarran,* 149 Cal.App.4th 214 (2007) ..........................................................25

*People v. Avitia,* 127 Cal.App.4th 185 (2005) ...............................................................26

*People v. Carter,* 30 Cal.4th 1166 (2003) ......................................................................26

*People v. Cox,* 53 Cal.3d 618 (1991) .............................................................................25

*People v. Day,* 2 Cal.App.4th 405 (1992) ................................................................38, 39

People v. Frierson, 25 Cal.3d 142 (1979) .................................................................37, 39

*People v. Hernandez,* 33 Cal.4th 1040 (2004) ........................................................25, 26

*People v. Jones,* 186 Cal.App.4th 216 (2010)................................................................36

*People v. Ledesma,* 43 Cal.3d 171 (1987)........................................................33, 37, 39

*People v. Patterson,* 2 Cal.5th 885 (2017) .....................................................................33

*People v. Perez,* 114 Cal.App.3d 470 (1981) .................................................................25

*People v. Prunty,* 62 Cal.4th 59 (2015)...........................................................................21

*People v. Sanchez,* 58 Cal.App.4th 1435 (1997)...........................................................25

People v. Thimmes, 138 Cal.App.4th 1207 (2006)..........................................................37

*People v. Williams,* 16 Cal.4th 153 (1997) .....................................................................26

*Perry v. Rushen,* 713 F.2d 1447 (9th Cir.1983) .............................................................24

*Reiger v. Christensen,* 789 F.2d 1425 (9th Cir.1986) ....................................................25

*Riley v. Payne,* 352 F.3d 1313 (9th Cir. 2003)...............................................................35

*Roman v. Estelle,* 917 F.2d 1505 (9th Cir. 1990) .....................................................15

*Sanders v. Ratelle,* 21 F.3d 1446 (9th Cir. 1994) .....................................................38

*Schell v. Witek,* 218 F.3d 1017 (9th Cir. 2000) ........................................................39

*Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998) ........................................................39

*Strickland v. Washington,* 466 U.S. 668 (1984) ................................................passim

*United States v. Powell,* 469 U.S. 57 (1984) ............................................................17

*Vasquez v. Hillary,* 474 U.S. 245 (1986) .................................................................15

*Williams v. Taylor,* 529 U.S. 362 (2000) .................................................................12

*Yarborough v. Alvarado,* 541 U.S. 652 (2004) ........................................................12

*Yarborough v. Gentry,* 540 U.S. 1 (2003) ................................................................32

**Statutes**

28 U.S.C. § (e)(1) .....................................................................................................13

28 U.S.C. § 2244(d)(1)-(2) .......................................................................................14

28 U.S.C. § 2254 .......................................................................................................11

28 U.S.C. § 2254(d) .............................................................................................11, 13

28 U.S.C. § 2254(d)(1) .........................................................................................12, 13

28 U.S.C. § 2254(d)(1)-(2) .......................................................................................13

28 U.S.C. 2254(b)(1)(A) ...........................................................................................15

P.C. § 12022.53(d) ....................................................................................................18

P.C. § 12022.53(e) .....................................................................................................18

P.C. § 29805 ...................................................................................14

**Other Authorities**

ABA Standards for Criminal Justice Prosecution Function and Defense Function

   (3d ed. 1993) ...........................................................................36

Nat. Legal Aid & Defender Assoc., Performance Guidelines for Criminal Defense

   Representation (NLADA 1995)...............................................36

**Rules**

R.P.C. 1.1(a) ...................................................................................34

R.P.C. 1.2(a) ...................................................................................34

R.P.C. 1.3(a) ...................................................................................34

R.P.C. 1.4(a)(1)-(4) .........................................................................34

R.P.C. 1.4(b)....................................................................................34

R.P.C. 2.1 ........................................................................................35

R.P.C. 3.1(b)....................................................................................35

U.S.Sup.Ct. Rule 13.1 .....................................................................15

**Constitutional Provisions**

California Constitution, Article I, Section 15 ..................................54

U.S. Const., 14th Amend..............................................................passim

U.S. Const., 5th Amend.................................................................passim

U.S. Const., 6th Amend.................................................................passim

U.S. Const., 8th Amend..............................................................................54

**Code**

Evid. Code § 352 ....................................................................................26

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2254)

### 1.    Statement of the Case

Petitioner hereby incorporates paragraphs 1-36 of his Verified Petition for Writ of Habeas Corpus by a Person in State Custody, above, which includes the statement of facts.

### 2.    Law and Argument

### A.    Habeas Standards

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Harrington v. Richter,* 562 U.S. 86, 97 (2011). The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under 28 U.S.C. § 2254(d)(1), a state court's decision is "contrary to . . . clearly established Federal law," as determined by the United States Supreme Court, "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone,* 535 U.S. 685, 694 (2002). A state court's decision "involve[s] an unreasonable application of[ ] clearly established Federal law" as determined by the U.S. Supreme Court, within the meaning of § 2254(d)(1), "if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor,* 529 U.S. 362, 407 (2000). The Supreme Court has underscored that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). Accordingly, this Honorable Court may not grant habeas relief if "fairminded jurists could disagree over whether" the state court's decision was correct. *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).

The governing law is the law that existed at the time the state court rendered its decision. *Greene v. Fisher*, 565 U.S. 34, 40 (2011). With regard to Ninth Circuit Court of Appeals opinions, such may be persuasive authority for purposes of

determining whether a particular state court decision is an "unreasonable application" of Supreme Court law, and also may help to determine what law is "clearly established." *See MacFarlane v. Walter,* 179 F.3d 1131, 1139 (9th Cir. 1999) (looking to Ninth Circuit caselaw to confirm that Supreme Court case clearly establishes a legal rule); citing *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir. 1998) (holding that "to the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of the contested issue").

As to whether the state court unreasonably determined the facts in light of the evidence presented, the statement of facts from the last reasoned state court decision "is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence." *Moses v. Payne,* 555 F.3d 742, 746 n. 1, 751 (2009), citing 28 U.S.C. § 2254(d)(1)-(2) & (e)(1).

## B.    Timeliness

Pursuant to 28 U.S.C. § 2254(d), a "1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2254(d)(1). The limitation period shall run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1)-(2).

Petitioner respectfully submits that his instant petition is timely. On May 3, 2018, the trial court sentenced Petitioner to 52 years to life imprisonment. That same day, Petitioner filed a timely notice of appeal. On December 14, 2020, the California Court of Appeal, Fourth District, Division Two, reversed Petitioner's firearm possession conviction where he did not commit one of the prohibited enumerated offenses under P.C. § 29805, but affirmed in all other, relevant respects. On January 19, 2021, Petitioner filed a petition for review with the California Supreme Court which was denied on March 10, 2021.

Therefore, Petitioner's judgment of sentence became final on June 8, 2021, 90 days after the California Supreme Court denied his petition for review on direct appeal and Petitioner refrained from petitioning the United States Supreme Court for

writ of certiorari. *Bowen v. Roe,* 188 F.3d 1157, 1158-59 (9th Cir. 1999); U.S.Sup.Ct. Rule 13.1. Petitioner timely files the instant petition before June 8, 2022.

## C.    Exhaustion

Pursuant to 28 U.S.C. 2254(b)(1)(A), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" Claims must be raised in accordance with state procedural rules. *Edwards v. Carpenter,* 529 U.S. 446, 453 (2000). Fundamental to federal habeas is the principle that the highest state court should be given a fair opportunity to first rule on Petitioner's claims. *O'Sullivan v. Boerckel,* 526 U.S. 838, 847 (1999) (exhaustion requires presentation to highest state court where presentation is part of the state's ordinary appellate procedure). Appellate issues are only exhausted to the extent that the particular issue is included in a petition for review to the California Supreme Court. *Roman v. Estelle,* 917 F.2d 1505, 1506 (9th Cir. 1990). The federal claim must be "fairly presented" to the state courts. *Baldwin v. Reese,* 541 U.S. 27 (2004). Additional evidence may be admitted that does not "fundamentally alter" the claim originally presented to the state courts. *Vasquez v. Hillary,* 474 U.S. 245, 260 (1986).

Petitioner raised claims one through four in the California Court of Appeal and the California Supreme Court, which addressed the claims on the merits. Thus,

the claims are exhausted and subject to the AEDPA. Petitioner has not yet exhausted claims five or six. Along with the instant petition, Petitioner files an application for a stay pursuant to *Kelly v. Small*, 315 F.3d 1063 (9th Cir. 2003), while he exhausts his remedies in state court with respect to claims five and six.

### D.   Substantive Claims

### I.   Claim One—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Evidence Was Constitutionally Insufficient to Support the Jury's Findings that Both Petitioner and His Co-Defendant Personally and Intentionally Discharged a Firearm and Proximately Caused Great Bodily Injury Where the Undisputed Evidence Proved that Only One Bullet Struck the Victim, and Where it Violated Due Process to Treat the Jury's Verdicts as Mere Clerical Error.

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

The Supreme Court has held that inconsistent verdicts may stand when one of those verdicts is a conviction and the other an acquittal. *See United States v. Powell,* 469 U.S. 57, 65 (1984); *Dunn v. United States,* 284 U.S. 390, 393 (1932). The underlying rationale of these cases is that the acquittal on one count may be explained as an exercise of lenity by the jury that is not necessarily grounded in its view of the evidence. *See Dunn,* 284 U.S. at 393. In adhering to this rule in *Powell,* however, the Court noted:

> Nothing in this opinion is intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other.

*Powell,* 469 U.S. at 69 n. 8.

While *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and *Duncan v. Louisiana,* 391 U.S. 145 (1968), did not directly involve inconsistent guilty verdicts, each supports a requirement of rationality in the jury verdicts. *Apprendi* requires a jury to determine facts (other than the fact of a prior conviction) that increase a sentence beyond an otherwise-applicable statutory maximum. 530 U.S. at 490. *Duncan* guarantees a jury trial for crimes punishable by terms of imprisonment greater than that accorded petty offenses. 391 U.S. at 161–62. From these cases derive a due process requirement of a rational jury determination, which is violated by inconsistent guilty verdicts. *Ferrizz v. Giurbino*, 432 F.3d 990, 992–93 (9th Cir. 2005).

In *Masoner v. Thurman*, 996 F.2d 1003 (9th Cir. 1993), the Ninth Circuit held

that a

> due process challenge to a jury verdict on the ground that convictions
> of multiple counts are inconsistent with one another will not be
> considered if the defendant cannot demonstrate that the challenged
> verdicts are necessarily logically inconsistent. If based on the evidence
> presented to the jury any rational fact finder could have found a
> consistent set of facts supporting both convictions, due process does not
> require        that        the        convictions        be        vacated.

*Masoner v. Thurman*, 996 F.2d 1003, 1005 (9th Cir. 1993).

In the state court, the People charged Petitioner and co-defendant Fard

Muhammad as principles and that a principle personally and intentionally discharged

a firearm and proximately caused great bodily injury and death to another pursuant

to P.C. § 12022.53(d) and (e). The jury was charged in this manner also. The jury

found for the personal and intentional discharge enhancement as to both defendants

although there was only one victim who only died as a result of one gunshot wound.

Verisimilitude only permitted the jury to find that either Petitioner or co-defendant

fired the shot that killed the victim, not both, since the victim did not suffer more

than one fatal gunshot wound. Thus, the jury rendered verdicts on multiple counts

that were necessarily logically inconsistent and which violate due process. The

prosecutor could not have tried the co-defendants separately and argued, based on

the evidence, that each defendant was responsible for the fatal shot in each respective

trial. The jury's verdict in this case was resoundingly clear, and thus not the result

of a clerical error. The jury's resolution of this issue, based on the questions asked and materials requested, turned on who had possession of and employed firearms during the encounter. The error is not harmless where the jury's verdict does not comport with due process.

**II.  Claim Two—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erred in Failing to Instruct the Jury that in a Case with Gang-Related Charges, and Involvement by Individuals with Multiple Gang Allegiances, Each Defendant Must Be Found to Have Committed the Crime For the Benefit of, at the Direction of, or in Association with a Particular Gang.**

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

"When considering an allegedly erroneous jury instruction in a habeas proceeding, an appellate court first considers whether the error in the challenged instruction, if any, amounted to 'constitutional error.'" *Evanchyk v. Stewart,* 340

F.3d 933, 939 (9th Cir. 2003) (internal quotation marks and citation omitted). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil,* 541 U.S. 433, 437 (2004). But "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Id.* The appropriate inquiry "is whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." *Id.,* quoting *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (internal quotation marks omitted). "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id.,* quoting *Boyde v. California,* 494 U.S. 370, 378 (1990) (internal quotation marks omitted).

"If the charge as a whole is ambiguous, the question is whether there is a 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.,* quoting *Estelle, supra,* at 72. But this "reasonable likelihood" inquiry does not apply when the disputed instruction is erroneous rather than ambiguous. *See Boyde, supra,* at 380 (distinguishing situations when the test would apply from those where the instruction at issue was "concededly erroneous [or] found so by a court"); *see also Ho v. Carey,* 332 F.3d 587, 592 (9th Cir. 2003).

In *People v. Prunty,* the defendant argued the People failed to introduce sufficient evidence to prove he had committed the underlying offenses for the benefit

of a criminal street gang, contesting the People's theory that the relevant ongoing organization, association, or group was the gang known as the Norteños in general. *People v. Prunty,* 62 Cal.4th 59, 70 (2015). Specifically, the defendant contended "the prosecution's use of crimes committed by various Norteño subsets to prove the existence of a single Norteño organization ... improperly conflated multiple separate street gangs into a single Norteño gang without evidence of 'collaborative activities or collective organizational structure' to warrant treating those subsets as a single entity." (*Ibid.*)

The California Supreme Court agreed, holding,

> [W]here the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22, [subdivision] (f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets. That connection may take the form of evidence or collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization.

*Prunty,* 62 Cal.4th at p. 71.

In the state court, the People's theory of the case was that Colton City Crips ("CCC") was a criminal street gang and that Petitioner and co-defendant Muhammad were active members thereof. The People were permitted to present extensive

inflammatory evidence to this effect, to wit, other crimes the People argued were attributable to CCC. To this end, the People presented evidence of other Crip gangs that alleged assisted CCC in the instant crime—1200 Blocc Crips and Inland Empire, or "A1 Since Day 1." The purported impetus for the crime was a rivalry between 1200 Blocc Crips and Casa Blanca Crips. The People did not establish that CCC had any existing rivalry with the Casa Blanca Crips and thus must have endeavored to demonstrate that CCC was assisting 1200 Blocc Crips. The evidence demonstrated that the 1200 Blocc Crips retaliated against Sheldon after Antonio's death because they believed Sheldon was involved. Co-defendant Muhammad admitted that he was an A1 Since Day 1 Crip, not a CCC. Petitioner was supposedly an A1 Since Day 1 Crip as well. The People failed to present any evidence that A1 Since Day 1 and CCC ever officially collaborated, had the same hierarchical organization, or ever collaborated in any other manner. Thus, the People failed to demonstrate that the crime was gang-related or that Petitioner, assuming he were a gang member, sought to assist his own purported gang, not another's.

The criminal information, jury forms, and verdict forms did not specify that Petitioner sought to benefit CCC, the gang whose existence the prosecution sought to establish at trial, instead of some different gang. The party in question contained members of many different gangs as well as people who did not affiliate with any gangs. The People failed to tie the party or any of the actions to the CCC. This error

permitted the jury to find Petitioner guilty even if Petitioner and Mohammed, CCC members, came to the defense of members of third-party gangs and non-gang members, which is legally insufficient. Accordingly, the error was extremely prejudicial where the prosecution was excused of its burden to prove Petitioner's guilt beyond a reasonable doubt. This Honorable Court should grant the within writ and release Petitioner.

**III. Claim Three—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erred by Admitting a Rap Music Video Purportedly Depicting Petitioner in the Driver's Seat of a Car, Cocking an Object that Looks Like a Gun, and His Co-Defendant in the Passenger's Seat Throwing Gang Signs.**

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

This Honorable Court is not a state supreme court of errors; it does not review questions of state evidence law. On federal habeas this Honorable Court may only

consider whether the petitioner's conviction violated constitutional norms. *Engle v. Isaac,* 456 U.S. 107, 119 (1982); *Kealohapauole v. Shimoda,* 800 F.2d 1463, 1465 (9th Cir.1986), *cert. denied,* 479 U.S. 1068(1987). The question is whether the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair. *See Kealohapauole,* 800 F.2d at 1465.

To begin with, failure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief. *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *See Perry v. Rushen,* 713 F.2d 1447, 1453 (9th Cir.1983) ("Due process draws a boundary beyond which state rules cannot stray"), *cert. denied,* 469 U.S. 838 (1984). The issue is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point. As the Ninth Circuit explained in *Reiger v. Christensen:*

> The . . . issue is not whether introduction of [the evidence] violated state law evidentiary principles, but whether the trial court committed an error which rendered the trial so arbitrary and fundamentally unfair that it violated federal due process.

789 F.2d 1425, 1430 (9th Cir.1986) (internal quotations omitted); *see Gordon v. Duran,* 895 F.2d 610, 613 (9th Cir.1990) (petitioner not entitled to relief unless admission of evidence violated his right to a fair trial under due process clause).

California courts have long recognized the potentially prejudicial effect of gang membership. *People v. Albarran,* 149 Cal.App.4th 214, 227 (2007). As one California Court of Appeal observed: "[I]t is fair to say that when the word 'gang' is used in Los Angeles County, one does not have visions of the characters from 'Our Little Gang' series. The word 'gang' ... connotes opprobrious implications.... [T]he word 'gang' takes on a sinister meaning when it is associated with activities." *People v. Perez,* 114 Cal.App.3d 470, 479 (1981). Given its highly inflammatory impact, the California Supreme Court has condemned the introduction of such evidence if it is only *tangentially* relevant to the charged offenses. *People v. Cox,* 53 Cal.3d 618, 660 (1991) (disapproved of on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390.) In fact, in cases not involving gang enhancements, the Supreme Court has held evidence of gang membership should not be admitted if its probative value is minimal. *People v. Hernandez,* 33 Cal.4th 1040, 1047 (2004). "Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense." *People v. Sanchez,* 58 Cal.App.4th 1435, 1449 (1997).

Thus, as general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative. *People v. Avitia,* 127 Cal.App.4th 185, 192 (2005). Consequently, gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the evidence outweighs its prejudicial effect. *People v. Williams,* 16 Cal.4th 153, 193 (1997); see generally Evid. Code § 352. "Evidence of the defendant's gang affiliation—including evidence of the territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" *People v. Hernandez,* 33 Cal.4th at p. 1049.) Nonetheless, even if the evidence is found to be relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury. *People v. Williams,* 16 Cal.4th at p. 193; *People v. Carter,* 30 Cal.4th 1166, 1194 (2003) [evidence of defendant's gang membership although relevant to motive or identity creates a risk the jury will improperly infer defendant has a criminal disposition and is therefore guilty of the charged offense and thus must be carefully scrutinized].)

Here, as set forth above, the prosecution was permitted to admit extensive gang evidence as to Petitioner where Petitioner did not contest this fact in state court. Therefore, the evidence was irrelevant where it did not tend to make the fact that Petitioner was a gang member any more or less likely. The trial court did not issue a limiting instruction to the jury as to how to consider this evidence in resolving the question of Petitioner's guilt or innocence, and thus the jury was not properly instructed and was not qualified to render a verdict in this case. The video in question was admitted solely with respect to establishing co-defendant Muhammed's gang membership, and the spillover prejudice *a la Bruton v. United States*, 391 U.S. 123 (1968), violated due process. The evidence was thus wholly prejudicial and permitted the jury to convict Petitioner based on a generalized fear of gang violence rather than the merits of the case. The rap music video not only referenced gangs but also depicted Petitioner holding a gun and rapping and the co-defendant Muhammad flashing gang signs. Accordingly, the prejudicial effect was exponentially compounded especially given the evidence set forth *intra* demonstrating that Petitioner is innocent. Accordingly, this Honorable Court should grant the within Writ and release Petitioner.

**IV.    Claim Four—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Evidence Shows it Was Factually Impossible for Either Petitioner or His Co-Defendant to Have Killed the Victim.**

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

The United States Supreme Court explained the relationship between the Due Process Clause of the United States Constitution and the requirement that the prosecution prove its case beyond a reasonable doubt:

> The requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation. The 'demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, (though) its crystallization into the formula 'beyond a reasonable doubt' seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt.' C. McCormick, Evidence § 321, pp. 681-682 (1954); see also 9 J.

Wigmore, Evidence, § 2497 (3d ed. 1940). Although virtually unanimous adherence to the reasonable-doubt standard in common-law jurisdictions may not conclusively establish it as a requirement of due process, such adherence does 'reflect a profound judgment about the way in which law should be enforced and justice administered.' *Duncan v. Louisiana*, 391 U.S. 145, 155, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968).

Expressions in many opinions of this Court indicate that it has long been assumed that proof of a criminal charge beyond a reasonable doubt is constitutionally required. See, for example, *Miles v. United States*, 103 U.S. 304, 312, 26 L.Ed. 481 (1881); *Davis v. United States*, 160 U.S. 469, 488, 16 S.Ct. 353, 358, 40 L.Ed. 499 (1895); *Holt v. United States*, 218 U.S. 245, 253, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910); *Wilson v. United States*, 232 U.S. 563, 569-570, 34 S.Ct. 347, 349, 350, 58 L.Ed. 728 (1914); *Brinegar v. United States*, 338 U.S. 160, 174, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *Leland v. Oregon*, 343 U.S. 790, 795, 72 S.Ct. 1002, 1005, 1006, 96 L.Ed. 1302 (1952); *Holland v. United States*, 348 U.S. 121, 138, 75 S.Ct. 127, 136, 137, 99 L.Ed. 150 (1954); *Speiser v. Randall*, 357 U.S. 513, 525-526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). Cf. *Coffin v. United States*, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481 (1895). Mr. Justice Frankfurter stated that '(i)t [is] the duty of the Government to establish [. . .] guilt beyond a reasonable doubt. This notion—basic in our law and rightly one of the boasts of a free society—is a requirement and a safeguard of due process of law in the historic, procedural content of 'due process.'' *Leland v. Oregon, supra*, 343 U.S., at 802—803, 72 S.Ct., at 1009 (dissenting opinion). In a similar vein, the Court said in *Brinegar v. United States, supra*, 338 U.S., at 174, 69 S.Ct., at 1310, that '(g)uilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property.' *Davis v. United States, supra*, 160 U.S., at 488, 16 S.Ct., at 358 stated that the requirement is implicit in 'constitutions [. . .] (which) recognize the fundamental principles that are deemed essential for the protection of life and liberty.' In *Davis* a murder conviction was reversed because the trial judge instructed the jury that

it was their duty to convict when the evidence was equally balanced regarding the sanity of the accused. This Court said: 'On the contrary, he is entitled to an acquittal of the specific crime charged, if upon all the evidence, there is reasonable doubt whether he was capable in law of committing crime [. . . .] No man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them [. . .] is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged.' *Id*., at 484, 493, 16 S.Ct., at 357, 360.

The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' *Coffin v. United States, supra*, 156 U.S., at 453, 15 S.Ct., at 403. As the dissenters in the New York Court of Appeals observed, and we agree, 'a person accused of a crime [. . .] would be at a severe disadvantage, a disadvantage amounting to a lack of fundamental fairness, if he could be adjudged guilty and imprisoned for years on the strength of the same evidence as would suffice in a civil case.'24 N.Y.2d, at 205, 299 N.Y.S.2d, at 422, 247 N.E.2d, at 259.

The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt. As we said in *Speiser v. Randall, supra*, 357 U.S., at 525-526, 78 S.Ct., at 1342:

There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defends his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of [. . .] persuading the factfinder at the conclusion of the trial of his guilt beyond a

reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of [. . .] convincing the factfinder of his guilt.

To this end, the reasonable-doubt standard is indispensable, for it 'impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.' Dorsen & Rezneck, In Re Gault and the Future of Juvenile Law, 1 Family Law Quarterly, No. 4, pp. 1, 26 (1967).

Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

In re Winship, 397 U.S. 358, 361-64 (1970).

Here, the People failed to establish that it was physically possible for Petitioner to have killed his friend, Antonio. Even assuming arguendo that Petitioner were a shooter, he would have had to turn around and hit Antonio from a distance of over 100 feet. The evidence unequivocally demonstrated that the shooters were firing in a southward direction and that the victim was north of them due to the location of the shell casings. The People's own theory that the shooting was gang-

related supported the conclusion that, if Petitioner were a shooter, he would have been firing in a southward direction since that is where everyone was walking after being kicked out of the party. Petitioner would have had no motive to fire in a northward direction where there were no longer any rival gang members. The bullet that struck Antonio was clearly fired by some third party firing in a northward direction toward the cul-de-sac, not Petitioner or co-defendant Muhammed. The state court relied on conclusions not supported by the evidence in rejecting Petitioner's contention, such as the possibility that Antonio was actually next to Petitioner while Petitioner purportedly fired; none of the witnesses placed him next to Petitioner, but rather at a vehicle located to the north of the fracas. Accordingly, this Honorable Court should grant the within Writ and release Petitioner.

## V.   Claim Five—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to Trial Counsel's Ineffectiveness.

The Sixth Amendment guarantees a criminal defendant's right to the effective assistance of counsel. *Yarborough v. Gentry,* 540 U.S. 1, 5 (2003) (per curiam). This right is violated when defense counsel's performance falls below an objective standard of reasonableness under prevailing professional norms, and counsel's errors seriously prejudice the defendant. *Strickland v. Washington,* 466 U.S. 668, 687 (1984).

Under both the United States Constitution and the California Constitution, a defendant's right to counsel does not merely consist of a right to "some bare assistance" of counsel; rather, a defendant has a right "to *effective* assistance." *People v. Ledesma,* 43 Cal.3d 171, 215 (1987) (emphasis in original).

In order to demonstrate ineffective assistance of counsel, Petitioner first "must show that counsel's performance was deficient" and second "must show that the deficient performance prejudiced the defense." *Id*. In order to establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at p. 688. In order to demonstrate prejudice, Petitioner must show that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at p. 694.

Thus, claims of ineffective assistance of counsel are evaluated pursuant to a two-step process:

> First, the court must determine whether counsel's representation fell below an objective standard of reasonableness, as judged by prevailing professional norms. Second, the court must determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*People v. Patterson,* 2 Cal.5th 885, 900 (2017) (internal citations omitted).

Pursuant to the California Rules of Professional Conduct ("R.P.C."), a lawyer shall not intentionally, recklessly, with gross negligence, or repeatedly fail to perform legal services with competence. R.P.C. 1.1(a). A lawyer shall abide by a client's decisions concerning the objectives of representation and shall reasonably consult with the client as to the means by which they are to be pursued. R.P.C. 1.2(a). The client has the ultimate authority to determine the purposes to be served by legal representation. *Id*., Comment, § 1. A lawyer shall not intentionally, repeatedly, recklessly, or with gross negligence fail to act with reasonable diligence in representing a client. R.P.C. 1.3(a). A lawyer shall: (1) promptly inform the client of any decision or circumstance with respect to which disclosure of the client's information is required; (2) reasonably consult with the client about the means by which to accomplish the client's objectives in the representation; (3) keep the client reasonably informed about significant developments relating to the representation, including properly complying with reasonable requests for information and copies of significant documents when necessary to keep the client so informed; and (4) advise the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the rules. R.P.C. 1.4(a)(1)-(4).

A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. R.P.C. 1.4(b). In

representing a client, a lawyer shall exercise independent professional judgment and

render candid advice. R.P.C. 2.1. A lawyer for the defendant in a criminal proceeding

may defend the proceeding by requiring that every element of the case be

established. R.P.C. 3.1(b).

It is well settled that trial counsel "has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations

unnecessary." *Strickland,* 466 U.S. at p. 691. Counsel has a "duty to conduct careful

factual and legal investigations and inquiries with a view to developing matters of

defense in order that he may make informed decisions on his client's behalf both at

the pleading stage and at trial." *In re Saunders,* 2 Cal.3d 1033, 1043-44 (1970)

(citations omitted).

> We have held that "a lawyer who fails adequately to investigate, and to introduce into evidence, evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance."

*Riley v. Payne,* 352 F.3d 1313, 1318 (9th Cir. 2003).

Standard 4–4.1(a) of the ABA's Standards for Criminal Justice Prosecution

Function and Defense Function states:

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of facts constituting guilt or the accused's admissions or statements to defense

counsel of facts constituting guilt or the accused's stated desire to plead guilty.

ABA Standards for Criminal Justice Prosecution Function and Defense Function (3d ed. 1993), p. 181.

Commentary to this standard, which is entitled "*The Importance of Prompt Investigation,*" emphasizes that "[e]ffective investigation by the lawyer has an important bearing on competent representation at trial, for without adequate investigation the lawyer is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial or to conduct plea discussions effectively." *Id.* at p. 183. The ABA commentary states that "[f]ailure to make adequate pretrial investigation and preparation may also be grounds for finding ineffective assistance of counsel." *Ibid.,* citing *Strickland,* 466 U.S. at p. 691. Standards promulgated by the National Legal Aid and Defender Association similarly provide that "[c]ounsel has a duty to conduct an independent investigation regardless of the accused's admissions or statements to the lawyer of facts constituting guilt" and emphasize that "[t]he investigation should be conducted as quickly as possible." Nat. Legal Aid & Defender Assoc., Performance Guidelines for Criminal Defense Representation (NLADA 1995) Guideline 4.1.

The foregoing standards describe an investigatory responsibility that has long been imposed on criminal defense counsel by federal and state courts. *People v. Jones,* 186 Cal.App.4th 216, 237–39 (2010). The *Strickland* court described the duty

of such counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at p. 691. The California Supreme Court has made clear the right of a criminal defendant to expect not just that his counsel will undertake those actions that a reasonably competent attorney would undertake, but as well "that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics *founded on adequate investigation and preparation.*" *People v. Ledesma,* 43 Cal.3d at p. 215, italics added, citing *In re Hall,* 30 Cal.3d 408, 426 (1981); *People v. Frierson,* 25 Cal.3d 142, 166 (1979); and *Strickland,* 466 U.S. at pp. 690–691; accord, *In re Edward S.,* 173 Cal.App.4th 387, 407 (2009) ["a defense attorney who fails to investigate potentially exculpatory evidence, including evidence that might be used to impeach prosecution witnesses, renders deficient representation"]; *People v. Thimmes,* 138 Cal.App.4th 1207, 1212 (2006) ["standard of reasonable competence requires defense counsel to diligently investigate the case"].)

As stated in *In re Neely,* 6 Cal.4th 901 (1993), a case involving ineffective assistance in connection with a motion to suppress evidence, "[i]n order to render reasonably competent assistance, a criminal defense attorney should investigate carefully the possible grounds for seeking the suppression of incriminating evidence, explore the factual bases for defenses that may be available to the defendant, and otherwise pursue diligently those leads indicating the existence of evidence

favorable to the defense. [Citations.]" *Id.* at p. 919. The reason the duty to investigate must be discharged promptly is so witnesses can be interviewed while events are fresh in their memories. As has been said, "[t]he effects of the passage of time on memory or the preservation of physical evidence are so familiar that the importance of *prompt* pretrial preparation cannot be overstated." *Lavallee v. Justices in Hampden Sup. Ct.,* 442 Mass. 228 (2004), italics added.

To determine whether a defendant was deprived of adequate representation due to defense counsel's failure to call a witness, there must be a showing that the testimony of said witness was material, necessary, or admissible and that defense counsel did not exercise proper judgment in failing to call him. *In re Noday,* 125 Cal.App.3d 507 (1981).

If defense counsel fails to call an exculpatory witness, counsel's assistance may be found to be constitutionally deficient. *People v. Day,* 2 Cal.App.4th 405 (1992) (defense counsel failed to investigate and call evidence to substantiate a claim of battered women's syndrome); *Sanders v. Ratelle,* 21 F.3d 1446 (9th Cir. 1994) (writ of habeas corpus issued in circumstances where defense counsel failed to investigate and call the culprit who had confessed to the crime); *In re Hall,* 30 Cal.3d 408 (1981) (defense counsel failed to investigate and to call exculpatory witnesses).

California courts have repeatedly found that defense counsel's failure to introduce expert evidence to support a defense theory constitutes deficient

performance in circumstances where defense counsel did not make sufficient inquiries to make an informed tactical decision. *In re Cordero,* 46 Cal.3d 161 (1988); *People v. Ledesma,* 43 Cal.3d 171 (1987); *People v. Frierson,* 25 Cal.3d 142 (1979). In fact, in many of the cases where a court has ruled that a defendant was deprived of his or her constitutional right to the effective assistance of counsel or where the court ordered an evidentiary hearing, the basis for the claim stemmed from an inadequate investigation into forensic evidence and/or expert testimony. *People v. Day,* 2 Cal.App.4th 405 (1992) (defense counsel's failure to investigate expert testimony); *Seidel v. Merkle,* 146 F.3d 750 (9th Cir. 1998) (defense counsel's failure to investigate PTSD); *In re Sixto,* 48 Cal.3d 1247 (1989) (defense counsel failed to adequately test for PCP usage and blood alcohol level); *Baylor v. Estelle,* 94 F.3d 1321 (9th Cir. 1996) (Defense counsel's failure to introduce evidence of inconsistent blood type); *Cam v. Calderon,* 165 F.3d 1223 (9th Cir. 1999) (evidentiary hearing ordered with respect to defense counsel's failure to investigate neurotoxins exposure); *Schell v. Witek,* 218 F.3d 1017 (9th Cir. 2000) (evidentiary hearing ordered with respect to defense counsel's failure to consult an independent fingerprint expert).

The judgment and sentence were imposed, rendered, and sustained in violation of the United States Constitution in that trial counsel's failure to effectively

investigate, uncover, and present evidence of Petitioner's innocence deprived Petitioner of the effective assistance of counsel.

If a hearing were granted, the following would be established. The People's theory of the case was that Petitioner accidentally shot his friend Antonio Williams while attempting to shoot rival gang members in retaliation for a fight that occurred at a party. To that end, the People presented, *inter alia*, the testimony of Sheldon Bruce and Armando Williams.

Armando, the decedent's brother, offered conflicting accounts to where his car was parked vis-à-vis the party house, which was a question of the utmost importance to the case since Antonio was with Armando at Armando's car when he was shot. (2RT 317-318, 323.) Petitioner's position with respect to Antonio and Armando was thus crucial to determining whether it was possible for Petitioner to have fired a bullet which struck Antonio. At the preliminary hearing for the original case against Bruce and Petitioner, which was dismissed and then refiled with Petitioner and Muhammed as the defendants, Armando testified that he was ducking behind his car and saw Petitioner ducking there as well as the shots were being fired. Armando did not see a gun in Petitioner's hand. This prosecution was ultimately dismissed due to lack of evidence. Armando changed his testimony after Bruce was offered a deal and the prosecution refiled the case. Armando ultimately changed his story three times and read the discovery paperwork before giving a statement.

Trial counsel was ineffective for failing to investigate and interview Armando prior to trial and impeach him with the above evidence, especially where Armando would recant his testimony and establish that Petitioner was squatting down, hiding, at the time the shots were being fired. (Exhibit D.) Armando does not believe that Petitioner shot Antonio and never saw Petitioner with a gun. (Exhibit D.) Armando further would have recanted the purported motive. (Exhibit D.)

Even assuming *arguendo* that Petitioner were a shooter, he would have had to turn around and hit Antonio from a distance of over 100 feet. The evidence unequivocally demonstrated that the shooters were firing in a southward direction and that the victim was north of them due to the location of the shell casings. (2RT 202, 278, 323, 328; 3RT 458.) The People's own theory that the shooting was gang-related supported the conclusion that, if Petitioner were a shooter, he would have been firing in a southward direction since that is where everyone was walking after being kicked out of the party. Petitioner would have had no motive to fire in a northward direction where there were no longer any rival gang members there. The bullet that struck Antonio was clearly fired by some third party firing in a northward direction toward the cul-de-sac, not Petitioner or co-defendant Muhammed. None of the witnesses placed Antonio next to Petitioner, but rather at a vehicle located to the north of the fracas.

Armando's recantation would have resulted in a different verdict since it would have negated any notion that Antonio was positioned anywhere near Petitioner's line of fire. It would have reinforced the fact that Petitioner would have had to turn around from his target and fire a shot that would travel over 100 feet to strike Antonio, which no reasonable jury would have accepted. The prejudicial effect of this error was compounded by trial counsel's failure to impeach Armando on cross-examination with his ever-changing version of events which was incompatible with the remainder of the witness testimony. (2RT 317-318, 323, 327-328, 330, 333, 339, 342-345; 3RT 460.)

Trial counsel was ineffective for failing to investigate commingling of stories between Armando and Sheldon Bruce before the two spoke with police. Indeed, Armando and Bruce were friends as they were party hopping together, Bruce drove Armando after the incident, and the three were originally charged together with murder before Bruce negotiated a plea deal to testify against Petitioner and Muhammad. Carter testified that there were group chats between all the witnesses, thus demonstrating that the witnesses discussed their testimony before speaking with police. (Exhibit B; 2RT 180.)

In exchange for his testimony, Bruce was permitted to plead to being an accessory after the fact with a gang enhancement and a sentence of five years in prison. Thus, Bruce's inclination to minimize his own involvement and maximize

Petitioner's involvement spilled over to and was shared by Armando. This much is clear by virtue of Bruce's plea deal and Armando's instant recantation. It is clear that this collusive relationship began before they even interacted with law enforcement.

Not only was Bruce's bias against Petitioner apparent from the fact that he entered into a contractual relationship to ensure his own liberty by giving away Petitioner's, but also Bruce's version of events markedly changed after he reached his agreement with the People. (3RT 441, 445, 452-454, 476.) Bruce's trial testimony was prejudicial to Petitioner since Bruce indicated that Petitioner fired first, was walking towards the crowd of rival gang members as he was firing, and gave his gun to a third party after the shooting. Bruce also offered prejudicial and highly inflammatory gang evidence against Petitioner. (3RT 408-411.) Bruce attempted to establish that Petitioner's presence in Arizona following the shooting amounted to Petitioner's consciousness of guilt, but Petitioner was required to travel to Arizona to retrieve his vehicle, which was being repaired there. Trial counsel also failed to challenge Bruce's hearsay statement from Kiesha implying that Petitioner was responsible for the shooting. (3RT 471.)

Bruce testified that his window was shot following the incident, casting further suspicion onto Petitioner. (3RT 476.) However, Bruce testified at the preliminary hearing that he would lie to save his life, and trial counsel was

ineffective for failing to impeach Bruce with this fact. Unique established that Bruce was a shooter. Trial counsel's failure to impeach Bruce and expose Bruce's deliberate falsehood in the eyes of the jury was extremely prejudicial to Petitioner at trial.

Trial counsel failed to effectively argue that when Petitioner and Bruce were initially charged together, Muhammed was not yet charged. (Exhibit A.) This prosecution was originally dismissed for lack of evidence. (Exhibit A.) It is only after Bruce changed his story so as to cooperate with police that he falsely implicated Petitioner and opened the door to gang evidence by virtue of implicating Muhammed. Since Muhammed was a gang member, Bruce and the People were aware that this prejudice would spillover onto Petitioner. There were no gang allegations in the original prosecution that was withdrawn. Without the prejudice resulting from the gang evidence, as discussed in further detail below, Petitioner would not have been convicted of any of the offenses.

A portion of trial counsel's ineffectiveness is attributable through no fault of his own to his admitted hearing loss. However, by not taking precautionary measures to ameliorate these conditions, trial counsel was unable to effectively defend Petitioner at trial by failing to subject the People's evidence to meaningful adversarial testing. Counsel repeatedly asked witnesses to repeat their testimony or

speak louder. Counsel did not sit next to Petitioner at trial, so Petitioner was not able to discuss witness testimony or assist in crafting questions for cross-examination.

Trial counsel was ineffective for failing to investigate and present Candice Bryant, Tai Vey McNeal, and Keisha McNeal who were ready, willing, and able to testify that there was at least one other shooter. Tai Vey would have testified that Petitioner was not involved in the fight inside of the house and was trying to get away from it. (Exhibit C.) When the shooting began, Tai Vey observed Petitioner crouching behind a car without any weapons. (Exhibit C.) Tai Vey observed the shooter, and it was not Petitioner. (Exhibit C.) Curiously, Tai Vey told police that he heard three different types of guns being used during the shooting, which would have established that there were at a least three shooters and supported Petitioner's defense. (Exhibit C.) Counsel neglected to avail himself of this fact at trial, inuring to Petitioner's detriment. The testimony would have established that there were three shooters and thus supported Petitioner's defense that it would have been physically impossible for him to have shot Antonio based on where the two were standing and that Antonio thus must have been shot by a third-party returning fire.

Trial counsel was ineffective for failing to retain an effective private investigator to investigate the above evidence and witnesses, as well as the following, which would have revealed evidence demonstrating Petitioner's innocence: the area of Sunset Rose Drive in Temescal Valley where the incident

occurred on March 6, 2016 (1RT 109, 114; 2RT 190, 263, 317-318; 3RT 444, 453);

Unique Jessie (1RT 31, 100, 104, 106-108, 112, 114); Savannah Carter (1RT 107-

108; 2RT 180); Mekaylah Reed (1RT 107-108; 2RT 180); "Baby C Note" (1RT 107-

108); Joseff Cody (1RT 33, 35-36, 39, 42-44, 46, 52, 73, 75); Investigator Ruben

Paz (3RT 519-520, 550-551, 553, 559, 660); Detective Michael Collins (3RT 611-

618, 620-624, 627-628, 630-642, 644-648); Sergeant Raymond Huskey; and

Delesandro Dean.

Trial counsel was ineffective in failing to retain a DNA expert since there was

blood at the crime scene which was never tested (3RT 539-540), and which would

have been instrumental to Petitioner's defense showing that it was physically

impossible for him to have shot Antonio. There were multiple people bleeding at the

scene. However, the People did not even test the substance to determine whether it

was blood, let alone whose blood it was. (3RT 660.) Whether the substance was in

fact blood and whose blood it was were very important questions at trial since the

blood was located next to the shell casings where at least one shooter was standing;

conclusively establishing who was positioned where during the encounter was vital

to case since Petitioner was prosecuted under the theory of transferred intent.

To this end, trial counsel was ineffective for failing to retain a firearms and

ballistics expert to testify regarding the thirteen .40 caliber and 7 nine-millimeter

shell casings that were recovered at the scene. (3RT 550.) There was mixed

testimony at trial as to where the shooters were located, where they were aiming, what types of guns they were using, and whether it was physically possible for Petitioner to shoot Antonio based on the manner in which he was shooting and his location. (3RT 519-520, 539-540, 550, 551, 553, 559.) The bullet that resulted in Antonio's death was from a medium caliber gun (3RT 594), and thus expert testimony regarding the characteristics of firearms was of the utmost importance at trial.

The People were permitted to present extensive, irrelevant, and highly prejudicial and inflammatory gang testimony that only tangentially related to Petitioner. (1RT 79-83, 88-91; 2RT 175-178, 180, 259; 3RT 397-399, 408-411; 611-618, 620-624.) Trial counsel was ineffective for failing to retain a gang expert to militate against the People's evidence, to wit, to demonstrate that the shooting in question was not committed for the benefit of a criminal street gang. The evidence demonstrated that the shooting occurred in the heat of passion as a result of a fracas that involved hundreds of partygoers with motives innumerable. That there were some gang members present from multiple different gangs which were never shown to have colluded in any manner is irrelevant to the question of the motivation for the shooting, and a gang expert would have demonstrated this. Because Petitioner was convicted based on highly inflammatory and irrelevant gang testimony, the error was prejudicial.

Trial counsel was ineffective for failing to file a *Batson/Wheeler* challenge where the prosecutor struck a majority of the African American venire members during jury selection, thus depriving both Petitioner and those jurors the right for those jurors to be present on Petitioner's jury panel.

To succeed on a charge of racial bias, a defendant first must establish a prima facie case of purposeful discrimination. *Batson v. Kentucky,* 476 U.S. 79, 93–94 (1986); *Tolbert v. Page,* 182 F.3d 677, 680 (9th Cir.1999) (en banc). The defendant must show that (1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race. *Batson, supra,* at 96; *Cooperwood v. Cambra,* 245 F.3d 1042, 1045–46 (9th Cir.2001). If the defendant failed to establish a prima facie case, then the motion properly was denied; the prosecutor need not have provided a race-neutral explanation for the strike. *Batson, supra,* at 96–97; *Cooperwood, supra,* at 1046.

To determine, at the first *Batson* step, whether racial bias motivated a prosecutor's decision to remove a potential juror, a court must consider the "totality of the relevant facts" and "all relevant circumstances" surrounding the peremptory strike. *Batson, supra,* at 94. Thus, when a defendant raises a plausible *Batson* claim, a court must analyze the context in which the contested peremptory strike arose. *See Johnson v. California,* 545 U.S. 152 (2005) (reversing the state court's denial of

habeas corpus because all three of the African American prospective jurors were stricken and the state court judges found the circumstances suspicious).

The next *Batson* step shifts the burden to the prosecutor to articulate a race-neutral reason for striking the jurors in question. *Batson, supra,* at 97-98. Finally, the Court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id*. at 98. "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another." *Washington v. Davis,* 426 U.S. 229, 242 (1976).

Petitioner thus established a prima facie case that there was an inference of a discriminatory purpose from the prosecutor's use of peremptory strikes since the prosecution ostensibly sought to root out individuals who would be sympathetic to Petitioner's cause and the nature of his case. The People would thus have needed to offer satisfactory race-neutral reasons justifying their actions, and thus the result of Petitioner's proceeding would necessarily have been different. Petitioner has been prejudiced as a result. This was an egregious deprivation of Petitioner's fundamental right to due process and to be tried by a jury of his peers.

Trial counsel was ineffective for failing to object to the change in the trial's venue without Petitioner's knowledge. Trial was to take place in Riverside Downtown Court, which would have had jurisdiction based on the locus of the

shooting; trial was ultimately moved to the Southwest Justice Center, which inured to Petitioner's detriment. Depending on route of travel, these two courthouses are between 38-51 miles away from one another, and over one-hour by car. Considering the gravity and nature of the crime, the size and nature of the community, the extent and nature of the publicity concerning the crime, and the status of the victim and accused, the change in venue deprived Petitioner of his constitutional rights to a fair and impartial jury, a fair trial consistent with due process, and a reliable guilt determination. *People v. Sanders,* 11 Cal.4th 475, 505 (1995). This error compounded upon the *Batson/Wheeler* error to deprive Petitioner of important trial rights.

Trial counsel rarely communicated with Petitioner, did not keep Petitioner apprised of the status of his case, and did not permit Petitioner to meaningfully participate in the preparation of his defense. Petitioner was prejudiced where counsel was unable to formulate an effective defense at trial despite the resources to do so. Counsel repeatedly stated that his caseload was overwhelming, which deprived him of the opportunity to invest the time and resources that Petitioner's defense required.

Trial counsel was ineffective for failing to enter into any negotiations with the People despite the fact that Petitioner was an excellent candidate for a plea deal based on the weakness of the People's case against him and the People's interest in conserving scarce judicial and prosecutorial resources. This error was prejudicial

where Petitioner received a sentence of 52 years to life imprisonment. Counsel could have had no tactical or strategic justification for this dereliction.

Accordingly, based upon trial counsel's failure to investigate and present readily available and exculpatory evidence of Petitioner's innocence, the investigation, prosecution, and trial cannot be said to have produced a just result that comports with due process. Accordingly, this Honorable Court should grant the within Writ and release Petitioner.

## VI.   Claim Six—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where He Is Legally, Factually, and Actually Innocent.

In *Herrera v. Collins,* 506 U.S. 390 (1993), a majority of the Supreme Court assumed, without deciding, that execution of an innocent person would violate the Constitution. The Supreme Court did not specify what showing would be required for a habeas petitioner to make out a successful freestanding claim of actual innocence. The Court stated only that the threshold would be "extraordinarily high," and that the showing would have to be "truly persuasive." *Herrera,* 506 U.S. at p. 417; *accord id.* at p. 426 (O'Connor, J., concurring). The Court found it unnecessary to be more specific because Herrera's showing was unconvincing under any standard. *See id.* at pp. 417–19; *accord id.* at pp. 424–27 (O'Connor, J., concurring).

Justice White stated that the required showing would have to be, at the bare minimum, the same as that required to invalidate a conviction because of insufficient

evidence under *Jackson v. Virginia,* 443 U.S. 307, 324 (1979), taking into account *all* the evidence, including both the newly proffered evidence and the evidence at trial. *See Herrera,* 506 U.S. at p. 429 (White, J., concurring in the judgment). Justice White, however, addressed only the minimum required showing; he did not find it necessary to decide finally what the threshold would be. *See id.*

The United States Court of Appeals for the Ninth Circuit concluded that the *Herrera* majority's statement that the threshold for a freestanding claim of innocence would have to be "extraordinarily high," *id.* at p. 417; *accord id.* at p. 426 (O'Connor, J., concurring), contemplates a stronger showing than insufficiency of the evidence to convict. *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997). It therefore declined to adopt the modified *Jackson* standard. *Id.* To be entitled to relief, a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt and must affirmatively prove that he is probably innocent. *See Herrera,* 506 U.S. at pp. 442–44 (Blackmun, J., dissenting).

Requiring affirmative proof of innocence is appropriate, because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally valid conviction. *Carriger*, 132 F.3d at p. 476. As Justice Blackmun explained,

> conviction after a constitutionally adequate trial strips the defendant of the presumption of innocence. The government bears the burden of proving the defendant's guilt beyond a reasonable doubt, but once the government has done so, the burden of proving innocence must shift to

the convicted defendant. The actual-innocence inquiry is therefore distinguishable from review for sufficiency of the evidence, where the question is not whether the defendant is innocent but whether the government has met its constitutional burden of proving the defendant's guilt beyond a reasonable doubt. When a defendant seeks to challenge the determination of guilt after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt about his guilt.

*Herrera,* 506 U.S. at p. 443 (Blackmun, J., dissenting); *accord id.* at 399–400 & 407 n. 6 (majority opinion) (noting that a valid conviction strips petitioner of the presumption of innocence and attaches a presumption of guilt). In light of the presumption of guilt that attaches after a constitutionally valid conviction, "it is fair to place on [a petitioner asserting a *Herrera* claim] the burden of proving his innocence, not just raising doubt about his guilt." *Id.* at p. 443 (Blackmun, J., dissenting).

For the reasons set forth in the above section, trial counsel was ineffective for failing to investigate or present extensive and weighty evidence of Petitioner's innocence such that the jury was not presented with an accurate picture of what transpired during the shooting. Based upon the above evidence, as well as Armando Williams' recantation, no reasonable juror would have convicted Petitioner for the reasons set forth in the above section.

Petitioner has been deprived of his fundamental constitutional right to his life and liberty without due process of the law in violation of the Sixth and Fourteenth Amendments to the United States Constitution and in violation of Article I, Section

15, of the California Constitution, which also guarantees Petitioner's right to due process. The restriction on Petitioner's liberty is illegal and contravenes his Eighth Amendment right against "cruel and unusual punishment." Petitioner has no other adequate remedy at law as the within Petition is based on material not included in the trial record and the issues presented in this Petition are only reviewable by a consideration of the facts presented in this Petition.

## CONCLUSION

WHEREFORE, based on the foregoing, this Honorable Court should grant Petitioner's Petition for Writ of Habeas Corpus.


Dated: April 27, 2022                                Respectfully submitted,


                                                     SPOLIN LAW P.C.


                                                         /s/ Aaron Spolin
                                            By:    _____
                                                     Aaron Spolin
                                                     Jeremy Cutcher
                                                     Attorneys for Petitioner

# EXHIBIT A

Charging Information

Criminal Case Report

**Pay Ticket / Case Fine**

Send me an email when this case is updated (click here)



Print This Report

Purchase Documents for this Case

Close This Window

# Case RIF1601160 - Defendants

| Seq | Defendant | Next Court Date | Status | Agency / DR Number | Arrest Date | Count 1 Charge | Violation Date |
|---|---|---|---|---|---|---|---|
| 1 | BRUCE, SHELDON B | Felony Settlement Conference 04/27/2016 AT 8:30 AM DEPT. 34 | ACTIVE | RSRC F160660002 | 03/09/2016 | PC 187(A) | 03/06/2016 |
| 2 | EUGENE, MARCUS COLUMBUS | Felony Settlement Conference 04/27/2016 AT 8:30 AM DEPT. 34 | ACTIVE | RSRC F160660002 | 03/09/2016 | PC 187(A) | 03/06/2016 |

# Case RIF1601160 - EUGENE, MARCUS COLUMBUS - Status

| | | | | |
|---|---|---|---|---|
| Filing Type | **Complaint** | | Custody | **In Custody** |
| Ordered Bail | **$1,000,000.00** | | Filing Date | **04/01/2016** |
| D.A. | **M MacDOnald** | | Posted Bail | **$0.00** |
| Next Action | **Felony Settlement Conference 04/27/2016 AT 8:30 AM DEPT. 34** | | Defense | |
| | | | Deputy Report #: | **RSRC-SW F160660002** |

| Warrant | Type | Status | Issued | Affidavit |
|---|---|---|---|---|
| | ARR | RECALLED | 04/04/2016 | N/A |
| Probation | Type | | Granted | Expiration |
| | N/A | | N/A | N/A |
| Sentence | Convicted Date | | Fine and Penalty | Restitution Fine |
| | N/A | | | 0 |

# Case RIF1601160 - EUGENE, MARCUS COLUMBUS - Charges

| Arrest Charges | | | | | | |
|---|---|---|---|---|---|---|
| Count | Charge | Severity | Description | Violation Date | Plea | Status |
| 1 | PC 187(A) | F | Murder | 03/06/2016 | | |

| Filed Charges | | | | | | |
|---|---|---|---|---|---|---|
| Count | Charge | Severity | Description | Violation Date | Plea | Status |
| 1 | PC 187(A) | F | Murder | 03/06/2016 | NOT GUILTY | ACTIVE |
| | Enhancement | | Description | | Plea | Status |
| | PC 12022.53(C) | | Intentionally discharge firearm | | | ACTIVE |
| | PC 12022.53(D) | | Discharge firearm causing GBI | | | ACTIVE |
| 2 | PC 245(B) | F | Assault with a semi-automatic firearm | 03/06/2016 | NOT GUILTY | ACTIVE |

  4G LTE 90% 8:50 AM

jimspub.riversidesheriff  ↻   MORE

 
JIMS Jail Information Management System

**The data contained in this website should not be relied upon for any type of legal action.**

| Booking Number :201614873 | | | | |
|---|---|---|---|---|
| **Name** | EUGENE, MARCUS COLOMBUS | | | |
| **Sex** | **Race** | **DOB** | | |
| M | B | 02/11/1997 | | |
| **Age** | **Hair** | **Eyes** | **Height** | **Weight** |
| 19 | BLK | BRO | 05'10" | 130 |
| **Arrest Date/Time** | **Arresting Agency** | | **Arresting Location** | |
| 04/15/2016 14:45 | Lake Elsinore | | MARICOPA CO. AZ | |
| **Booked Date/Time** | **Case No.** | | **Bail Amount** | |
| 04/15/2016 23:05 | F160660002 | | 01100000 | |
| **Current Facility** | Robert Presley Detention Cente | | **Housing Unit** | 23C8 |
| **Next Court Date/ Time** | **Court Name** | | **Release Date** | |
| 04/19/2016 08:00 | Riverside Hall Of Justice | | | |

| Charges | | | | | |
|---|---|---|---|---|---|
| **Charge** | **Type** | **Description** | **Bail** | **Disposition** | **Booking Type** |
| 187(A) | FEL | MURDER W/MALICE | 01100000 | | PC |
| 245(B) | FEL | ASLT W/DEADLY WPN/P.O. S | 01100000 | | PC |

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1047

    





jimspub.riversidesheriff    ↻    MORE




**The data contained in this website should not be relied upon for any type of legal action.**

| Booking Number :201609464 | | |
|---|---|---|
| **Name** | BRUCE, SHELDON B | |
| **Sex** | **Race** | **DOB** |
| M | B | 06/18/1997 |
| **Age** | **Hair** | **Eyes** | **Height** | **Weight** |
| 18 | BLK | BLK | 05'05" | 130 |
| **Arrest Date/Time** | **Arresting Agency** | **Arresting Location** |
| 03/09/2016 05:00 | Lake Elsinore | S ACACIA AVE, RIALTO |
| **Booked Date/Time** | **Case No.** | **Bail Amount** |
| 03/09/2016 06:50 | F160660002 | 01000000 |
| **Current Facility** | Southwest Detention Center | **Housing Unit** | GH23 |
| **Next Court Date/Time** | **Court Name** | **Release Date** |
| 04/27/2016 08:30 | Riverside Hall Of Justice | |

Public Visiting Guidelines

Additional Court Information

[New Search]

| Charges | | | | | |
|---|---|---|---|---|---|
| **Charge** | **Type** | **Description** | **Bail** | **Disposition** | **Booking Type** |
| 12022.53(C) | FEL | FELONY DISCH A FIREARM | 01000000 | NF | PC |
| 187 | FEL | MURDER | 01000000 | NF | PC |
| 187(A) | FEL | MURDER W/MALICE | 01000000 | CONT | PC |
| 245(B) | FEL | ASLT W/DEADLY WPN/P.O. S | 01000000 | CONT | PC |


Back


Forward


Home


Bookmarks


Tabs

# EXHIBIT B

Group Chat

●●○○○ T-Mobile 📶 12:53 PM 🔵 ⏱ 80% ▬▬
2:22-cv-03844-SVW-AFM Document 1 Filed 06/06/22 Page 76 of 95 Page ID
🔒 mobile.facebook.com



**Unique Traniecee**
Ik . We already told the story they got all our stories
We told em everything
Yesterday at 8:41pm · Sent from Messenger



**El Papo**
smh thats crazy is this is too much i swear so yall
seen whaa happened i thought yall was by the cars
when it all happened my bad for all the questions but
its juss all confusing and getting real
Yesterday at 8:43pm



**Unique Traniecee**
No but i seen the videos from the evidence we were
at the cars when the shooting part happened
Its alot mann they got a lot more stuff .. like
everything is coming out . Like what sheldon had to
do w. It .. quata mill .. & qp so its getting deep
Yesterday at 8:45pm · Sent from Messenger



**El Papo**
Smh this so fucced deep
Yesterday at 8:46pm



**Unique Traniecee**
Yeah fr its a lot going on . I found out a lot .
Yesterday at 8:47pm · Sent from Messenger



**El Papo**
man its crazy so now quata mill involved to
man its juss crazy this shit is crazy man
Yesterday at 8:51pm



**Unique Traniecee**
Yeah he been involved they just haven't got him idk
why
Yesterday at 8:53pm · Sent from Messenger

# EXHIBIT C

Tai Vey McNeal Statement

Date: 1-16-17

Name: TAIVAI MCNEILL

Address: 1864 W. Lincoln Apt # C

City/State/zip: San Bernardino, ca 92411

Home Phone _____

cell phone (323) 426-7624

Other Phone: _____

Email Address: teejay-three@yahoo.com

Date of Birth: September 9th, 1995

I am giving this statement of my own free will. I understand that Mark Cantrell is a private defense attorney who represents the defendant in this case and is not a police officer or a District Attorney. I understand that I am not obligated to agree to be interviewed by Mark Cantrell. I have not received anything of value and I have not been promised anything whatsoever in exchange for this interview.

This is my statement:

I was at party. Took own car. By myself Facebook invited everyone. Fight started but I don't know who started. Everyone ran toward door to leave. fight is inside house. I saw Marcus Before fight. Marcus not involved in the fight. Marcus runs out to avoid fight same time I do

About 31 minutes after I get
outside I hear gunshots.
I duck down & hide behind
a car, across street from house.

I look up after gunshots,
I see Marcus either on
sidewalk or on side of
street, in the street, close
to house a party.

See Exhibit A.

He is crouched down.
No weapons. We BOTH
walk towards the dead end
of the street. He got
into a car and took off.
He was on passenger side. I
did not see driver. I did
not recognize car.

During the shooting, I am & looking down street, away from dead end of the street.

I could hear the gunshots coming from my left and slightly behind me. I could see from corner of my eye it was black guy, and not Marcus.

I see victim who was shot. I am friends with Armando. Armando helping his brother Antonio who was shot. I help pick up Antonio & put into MY CAR, Pontiac, I go with them at hospital I drive them all to hospital In car is: 1 Armando & Antonio 3 Me.

Mercedes followed me to hospital.

Cops interview me at hospital. NFD



EXHiBiT  A

# RIVERSIDE COUNTY SHERIFF'S DEPARTMENT
## LAKE ELSINORE STATION
### NARRATIVE OF SUPPLEMENTAL

Subject: 187 (a) PC
Page 5

Dep. E. Enriquez #4919
Case # F160660002

1   About 0110 hours, I spoke to Fard Muhammad in front of the Emergency Room entrance.
2   The following is a summary of his statement. Muhammad said he and his group of Friends
3   (later identified as Antonio Williams, Armando Williams, TaiVai McNeil, Unique Jessie,
4   Mekaylah Reed, and Savannah Carter.) were in the party for about 30-45 minutes. They
5   were leaving the party and he heard an unknown amount of gun shots. Mahammad said,
6   he saw his friend (Antonio) laying in the street. He picked up Antonio and put him in the
7   back Antonio's black Mercedes. Armando was going to drive but was panicking because
8   his brother was shot, so Muhammad told Armando he would drive to the hospital.
9   Muhammad was uncertain on the time frames and did not know the exact time they arrived
10  at the hospital. I ended my conversation with him and allowed him to leave the area.

11

12  After speaking with Muhammad, I spoke to TaiVai McNeil at 0113 hours. The following is
13  a summary of his statement. McNeil said they arrived at the "Mansion" party at about 2300
14  hours. He said everything was fine inside the party, about an hour later McNeil said the
15  party was shut down. During that time people were fighting, and he did not know who was
16  fighting because he and all his friends are from San Bernardino. He said everyone went
17  outside and then he heard gunshots. McNeil believes he heard three different types of
18  guns used for a total of about eight rounds fired. Everyone outside the residence scattered
19  and he saw Antonio laying on the street. He and Muhammad picked up Antonio and put
20  him in the back of the Mercedes. Once Antonio was placed in the car, they drove away
21  from the location and looked for the nearest hospital on their phones. McNeil said he drove
22  the Pontiac and Armando was going to drive the Mercedes to the hospital. I ended my
23  conversation with him and allowed him to leave the area.

24

25  About 0132 hours, I spoke to Unique Jessie in the Emergency Lobby. The following is a
26  summary of her statement. Jessie Stated they were at the party and a "Big black dude"
27  walked up to them and asked "where are you from?" Jessie said the black male and her
28  friends got in an argument and started swing punches at them. Jessie describes the male
29  as bulky build, very dark complexion skin tone, about 6 feet 3 inches tall, and has a short
30  "faded" haircut. Her and the Female friends (Mekaylah and Savannah) separated the
31  parties and attempted to leave the party before it escalated.

32

33  As they were walking out TaiVai told her to get his car so they can leave. She ran to the
34  car (Pontiac) and started it, as she started the car she heard gunshots. She drove the car
35  to the front of the residence and saw a subject on the street. She said when she saw the
36  subject on the floor she did not know who it was. She recognized it was Antonio and she
37  exited the car she was in and helped put Antonio in the black Mercedes and stay with him.

# EXHIBIT D

Armando Williams Statement



## STEWART INVESTIGATIVE SERVICES, INC.
INVESTIGATIVE SOLUTIONS • CORPORATE SERVICES



June 17, 2016

Christopher Dorado, Esq.
Dorado & Dorado
1030 Nevada Street, Ste. 105
Redlands, CA 92374

Re: The People of the State of California vs. Marcus Eugene

## CONFIDENTIAL ATTORNEY CORRESPONDENCE

Mr. Dorado:

## ASSIGNMENT

You requested that I take a recorded statement from Armando Lemont Delray Williams in regards to the events of March 5 & 6, 2016, wherein his brother was shot and killed on a residential street in Temescal Valley / Corona, California.

## WITNESS BACKGROUND

Armando Lemont Delray Williams, Jr. was born on May 7, 1998. He currently resides at _____, and his contact telephone number is _____.

As a small child, Armando Williams, Jr. grew up on the eastside of Riverside, California with his parents and siblings. His father, Armando Williams, Sr. was a member of the 1200 Blocc Crips when they lived in Riverside, California. When Armando Williams was two or three years old, and his brother Antonio Williams was seven or eight years old, the whole family moved to Miami, Oklahoma.

111 E. State Street, Suite 201, Redlands, CA 92373-4780 Toll Free: 888.978.8393
Local: 909.484.1500  Fax: 909.484.0058

Armando Williams lived in Oklahoma for two to three years and Antonio Williams stayed there longer. Armando Williams moved to San Bernardino and lived with his grandmother. His parents moved back from Oklahoma and lived with Antonio Williams and his sisters in San Bernardino, California. The family never moved back to Riverside, California. Armando Williams knew his brother Antonio Williams was a member of the 1200 Bloc Crip street gang, but due to their age difference he did not know anything about his brother's involvement with the gang. Armando Williams denies ever being in a street gang himself. A year ago Armando Williams, Sr. was shot and killed. The circumstance of this incident was not explored with Armando Williams, Jr. at the time of the interview due to the sensitive nature of this subject. Less than a year ago, Armando Williams' mother was shot several times at a donut shop at the corner of Baseline and Waterman in San Bernardino, California. Apparently the suspects were shooting at a man who then tried to duck down where Armando's mother was hiding. The man died and his mother was severely wounded with five to six bullet wounds. She recovered and was relocated, along with her family, by some public agency to Victorville, California, where they currently reside.

Armando Williams, Jr. was arrested for domestic violence in October 2014 for assaulting his girlfriend at the time, Mariah Beam. He was convicted and sentenced to 20 days in jail. He does not have a restraining order against him. He and Mariah Beam have a two year old son together. He now has full custody of their son as he was able to prove she was an unfit mother.

He does not have a California driver's license, as he never bothered to get one. He does have a California identification card.

## R.S.O. SUMMATION OF EVENTS

**Antonio Angelo Williams** was shot and killed on March 6, 2016, while attending a party at 8120 Sunset Rose Drive, Temescal Valley, California. **Sheldon Bruce and Marcus Eugene** were arrested and charged with California Penal Code 187, (murder) in the death of Antonio Williams.

2

It is alleged by the Sheriff's department detectives that Antonio Williams was involved in a physical altercation with several black male adults inside the residence. Those involved were forced to leave the party. Once outside, two black male adults rushed to the top of the cul-de-sac and retrieved unknown items from the trunk and the driver's compartment of a white Dodge Charger. They ran back down the street and two houses south of 8120 Sunset Rose Drive fired bullets from 9mm and 40mm handguns, killing Antonio Williams. The shooters returned to the Dodge Charger and sped off.   Twenty (20) shell casings were recovered on the street north of Antonio Williams' vehicle.

Antonio Williams was transported to the Corona Regional hospital by **Fard Mohammad,** assisted by **Armando Williams**. **Fard Mohammad** drove to the party that night in a white and black Mercedes Benz.

At the hospital, detectives questioned Armando Williams who told them he and his brother Antonio Williams had just arrived at the party (implying they came together in the same vehicle) when a group of B/M/A's began to fight with another group of B/M/A's. When asked, Armando Williams stated he and his brother Antonio Williams were not involved in the altercation, but they decided to leave.

The detectives state in their report that, based on witness accounts, Antonio and Armando Williams were involved in the fight and Antonio Williams was the main aggressor. Armando Williams minimized any involvement in a street gang and denied fighting at the party. The detectives questioned Sheldon Bruce who gave conflicting accounts throughout his interview.  Sheldon Bruce initially denied being at the party and then alleged that Marcus Eugene had an ongoing dispute with Antonio Williams and that was the reason they were fighting in the house at the party. Sheldon Bruce stated that Marcus Eugene retrieved a 9mm handgun from the trunk of Sheldon Bruce's car and shot Antonio Williams. Sheldon Bruce was able to identify the make and model of the 9mm Smith & Wesson handgun Marcus Eugene fired based on the sound it made when firing. Sheldon Bruce denied shooting a gun that night and said **another unknown B/M/A shot at Antonio Williams.** Sheldon Bruce was arrested and charged with PC187-Homicide, and PC12022.53 (c) - Discharging a firearm in the commission of a

felony. At an unknown point in time, Marcus Eugene was arrested and charged with the same crimes.

### Armando Williams, Jr. Interview

On the evening of March 5, 2016, Armando Williams was contacted by his brother Antonio Williams and asked if he wanted to go to a party that Unique (he did not recall her last name which is Jessie) had invited him to. Antonio Williams contacted him on his cell phone at                        Armando Williams said, "Yes" and then showered and dressed. Armando Williams stated that Unique is a friend of the family. Around 9:30 p.m., Antonio Williams came over to pick up Armando Williams at his sister's house located at
Antonio Williams was in the process of moving out of his sister's place on
                        California and moving in with a girlfriend somewhere in San Bernardino, California. Around 10:00 p.m., Antonio Williams received a text message from Unique (Jessie) with the address of the party. Antonio Williams drove himself and Armando Williams to the party in Antonio Williams' Mercedes Benz 320E, four-door (1990's model), with a white hood & trunk and the rest is black. There was no one else in the vehicle. The paint job was of different colors due to parts being swapped out.

Armando Williams did not know that some of his friends were going to be at the party as this was an invitation Antonio Williams received. Neither one of them knew who was hosting the party.

Antonio and Armando Williams left home around 10:00 p.m. from San Bernardino and headed to Corona/Temescal Canyon. They did not make any stops along the way. They arrived at the party sometime between 10:30 p.m. and 10:40 p.m. At the gate to the community, Antonio Williams told the guard they were looking for the party. The guard took Antonio Williams' identification and wrote his information down. The guard did not ask for Armando Williams' identification and no one else was with them in the vehicle.

The arrived at the residence located at 8120 Sunset Rose Drive, Temescal Valley/Corona, California at approximately 10:50 p.m. – 11:00 p.m. Antonio Williams parked on the right side of the street, facing south and away from the end of the cul-de-sac, two houses down from where the party was located (see attached

4

Google Maps printout with Antonio's vehicle drawn in). They exited the vehicle, walked up the walkway to the front door, knocked and some unknown person answered the door and let them in. They walked straight back through the house towards the back patio door. They did not exit into the back yard. Armando Williams recognized some people at the party, but he cannot recall their names. Armando Williams stepped away from his brother to say hello to these people. Armando Williams recalled there were Hispanics, Caucasians and African Americans present at the party. Sheldon (could not recall his last name which is Bruce), Marcus Eugene and TJ (TaiVai McNeil) were present and Armando Williams said hello to them. Neither Armando nor Antonio Williams had anything to drink at the party. A minute or so after separating from Antonio, Armando Williams heard a commotion behind him. He turned around and saw several people getting into an argument. He could not see who was involved. Armando Williams saw his brother Antonio Williams walking towards him from that same direction and Antonio Williams said to him, "Let's go." Armando Williams remembered that Antonio Williams looked as if he had been fighting; he had an angry look on his face that told Armando Williams he was upset. When Armando Williams saw Antonio Williams coming from the direction of the commotion, it made him believe Antonio Williams may have been involved.

Armando Williams did not see his brother Antonio Williams swing or hit anyone or anyone swing or hit him. He never saw Antonio Williams getting physical with anyone at the party. Armando Williams did not hear anyone yell or say anything specific. He did not hear anyone make any threats.

As Armando and Antonio Williams walked out the front door of the residence, a few other people were leaving as well. Antonio and Armando Williams walked out the front door together. Once outside Armando Williams noticed there were people scattered around the neighborhood. As they started to walk towards the street, Armando Williams noticed approximately 10 people in front of them (African Americans / mostly men) and those people walked towards the exit of the cul-de-sac and stood out in the street (Grassland Drive & Sunset Rose Drive). He cannot recall if these 10 people said anything to him or Antonio Williams. Antonio Williams assumed they had been at the party. Armando Williams was not sure, but he was under the impression this group of African Americans were involved in the

fight inside the house. Armando Williams does not recall them yelling or saying anything that made him think they were part of a street gang.

Armando and Antonio Williams walked across the street and down a couple of houses to Antonio Williams' Mercedes Benz (black with a white hood and trunk). Armando Williams walked around the rear of the vehicle to the passenger side and Antonio Williams walked directly to the driver's door. At that point, Armando Williams saw T.J. (TaiVai McNeil) run past him from behind and into the area between two houses, on the same side of the street and slightly in front of Antonio Williams' vehicle. Then Armando heard gun shots. He could not tell where the shots were coming from. He got low by squatting down. As he did so, he saw Marcus Eugene behind his brother's vehicle, about six feet from the trunk kneeling down. Armando Williams also saw Mohammad (Fard Mohammad) drop down next to the passenger side of a vehicle parked directly behind Antonio Williams' vehicle. He did not see Sheldon (last name Bruce, not recalled by Armando). Armando Williams thought he heard 14 gun shots. When the shooting stopped, T.J. ran from where he was hiding between the houses, in front of Antonio Williams' vehicle and he shouted, "He shot." Armando Williams stated that no windows or bullets struck Antonio Williams' vehicle. Armando Williams got up and went around the front of Antonio Williams' vehicle and saw his brother lying on his back on the ground. His driver's door was not open. Antonio Williams said, "Help," and was speaking incoherently. Armando Williams tried to get his brother Antonio Williams' in the back seat of the vehicle, but he was struggling because Antonio Williams' weighed 180 pounds. T.J. and Mohammad came to his aid and helped him load his brother, Antonio Williams, in the backseat of his own vehicle. Unique (Jessie) was there and watching. As Armando Williams was loading Antonio Williams into the vehicle, he saw Marcus Eugene in the front passenger seat of a small white vehicle that had come from the end of the cul-de-sac and was traveling slowly by. He was not in Sheldon Bruce's vehicle, which is a white Dodge or Chrysler Charger. Armando Williams was certain that Marcus Eugene was not in Sheldon's vehicle and he did not see Sheldon Bruce's vehicle in the cul-de-sac. Marcus Eugene did not stop to help, and he kept driving off as a passenger. Armando Williams believes a girl was driving the car Marcus Eugene was in.

6

Armando Williams stated that no one forced him to come forward or threatened to harm him if he did not come forward to tell Marcus Eugene's defense team what he recalled happening at the party on March 5 & 6, 2016.

Armando Williams does not know who shot his brother Antonio Williams. He has a hard time believing that Marcus Eugene would have shot his brother as they never had any problems. Besides that, he has never seen Marcus Eugene or Sheldon Bruce with guns.

Marcus Eugene contacted Armando Williams via Snapchat within the week of Antonio Williams' death. He expressed sympathy to Armando Williams about what happened to his brother and was sad about the whole situation. Marcus Eugene wrote Armando Williams five times via Snapchat, but Armando Williams did not respond as he was upset with everyone and he was searching for answers. Marcus Eugene tried to call Armando Williams on Antonio Williams' cell phone as Armando had given him that number             over Snapchat. Antonio Williams' phone was a pre-paid cell phone. Antonio's telephone number is not currently active as the family has not put money on the account. The one time since this incident that Armando Williams and Marcus Eugene talked on the phone, it was a short conversation. At the time, Armando Williams was upset with Marcus Eugene for not coming to the hospital that night, but he did not express that to him.  Marcus Eugene told Armando Williams he was with a girl that night at the party, but did not say who she was. Armando Williams speculated that the girl Marcus Eugene was with have been the driver of the car who drove Marcus Eugene away from the cul-de-sac.

Armando Williams learned on Facebook that Marcus Eugene and Sheldon Bruce were arrested for shooting his brother, Antonio Williams. Armando Williams was speechless when he read this.

In May 2016, Armando Williams went to the second hearing for Sheldon Bruce and Marcus Eugene at the Riverside courthouse. After the hearing, Marcus Eugene's brothers spoke with Armando Williams and said they were sorry for his loss and they asked to know what had happened at the party. He told them he did not know what happened. They did not threaten him or promise him anything.

8

Armando Williams gave them his cousin's cell phone number in case they wanted to contact him.

Two weeks ago, one of Marcus' brothers called and asked Armando Williams if he wanted to read the discovery packet on Marcus Eugene's case. He agreed and they met. He recalled reading in the discovery packet that Antonio Williams was killed over something to do with Marcus Eugene and his sisters. Armando Williams stated that Marcus Eugene never tried to "come on" to his sisters who are 19 and 22 years of age. Marcus Eugene would never have had any negative interactions with Armando Williams' sisters and he never showed any interest in them. Antonio Williams was protective of his sisters, but he never beat up or threatened any of their boyfriends. The same allegations were made towards Sheldon Bruce who also never came on to Armando Williams' sisters. If anything like that were to happen, his sisters would have shared it with him.

Armando Williams did not contact the Sheriff's detectives in the months since his brother's death to share his observations about what happened that night. The reason is that he did not trust them after they tried to pit him and his mother against one another.

Armando Williams obtained Marcus Eugene's attorney's information from Marcus' brothers.

Armando Williams has never tried to visit Marcus Eugene in jail.

Armando Williams stated that Marcus Eugene was his and Antonio Williams' friend. He cannot think of anything that would have made them mad at each other on the night of the party.

Armando Williams knew Marcus Eugene from Sierra High School (continuation school) in San Bernardino, California. Armando Williams knew Sheldon Bruce through Marcus Eugene. Armando Williams has known Marcus Eugene for a year and a half. He considers Marcus Eugene to be a good friend and they hung out together a lot. Armando Williams hung out with Marcus Eugene almost every Friday and Saturday night. Sheldon Bruce hung out with them half the time; every other weekend. Marcus Eugene has a black Mercedes Benz, a four-door that was newer than Antonio Williams' vehicle.

Armando Williams first met Sheldon Bruce in 2014 or 2015 through Marcus Eugene. Sheldon Bruce is approximately 18 years of age. Sheldon Bruce and Marcus Eugene would hang out with Armando and Antonio Williams at their house from time to time and they never had a problem with each other. According to Armando Williams, Marcus Eugene and Antonio Williams never dated the same woman. Armando Williams stated there was at least a six-year age difference between Marcus Eugene and Antonio Williams and they would not have been dating girls of the same age. Armando Williams stated that, as far as he knows, neither Sheldon Bruce nor Marcus Eugene is in a street gang.

Marcus Eugene and Antonio Williams never had any negative interactions and would not have interacted outside of Armando Williams' presence. The same is true of Sheldon Bruce and Antonio Williams. There were never any issues between him and Antonio Williams.

Armando Williams stated that he has never seen Marcus Eugene or Sheldon Bruce fight with anyone nor has he ever observed them taking illegal drugs.

Best Regards,

Jeff Stewart
Licensed Private Investigator
PI 22439

13

# CERTIFICATE OF SERVICE

Case Name: Marcus Columbus Eugene on Habeas Corpus

I hereby certify that on June 6, 2022, I electronically filed the following document with the Clerk of the Court using the CM/ECF system:

**Verified Petition for Writ of Habeas Corpus; Memorandum of Points and Authorities**

I also served Petitioner's **Verified Petition for Writ of Habeas Corpus; Memorandum of Points and Authorities**, by causing to be placed a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail, addressed as follows:

LEGAL MAIL
Marcus Columbus Eugene, CDCR No. BG2254
San Quentin State Prison
Housing: 3AC6
San Quentin, CA 94974
**Via US Mail**

I declare under penalty of perjury that the foregoing is true and correct, and this declaration was executed at Los Angeles, California, on June 6, 2022.

/s/ Aaron Spolin
_____
Aaron Spolin